UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
UNITED STATES OF AMERICA,

                -against-

ANTHONY CHRISTOPHER MENDONCA,

                            Defendant.
----------------------------------------------------------------X

**REPORT & RECOMMENDATION**
18-CR-671-BMC-SJB

**BULSARA, United States Magistrate Judge:**

Defendant Anthony Christopher Mendonca ("Mendonca") moves to suppress statements made during an interview, following a polygraph test, pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). It is respectfully recommended that the motion to suppress be denied.

FACTUAL AND PROCEDURAL BACKGROUND

On November 20, 2018, law enforcement executed a federal search warrant at Mendonca's residence. (Compl. dated Nov. 21, 2018, Dkt. No. 1 ¶ 7). Law enforcement seized electronic devices; a preliminary review revealed the presence of child pornography. (*Id.* ¶ 8). At Mendonca's residence, law enforcement read Mendonca his *Miranda* rights, which he waived by answering questions.[1] (*Id.* ¶ 9; Audio Recording of Interview of Anthony Mendonca dated Nov. 20, 2018 ("Home Interview Recording"), attached as Ex. 1 to Gov't's Resp. in Opp. to Mot., Dkt. No. 27 at 1:21–1:37; Tr. of Interview of Anthony Mendonca by Det. Anthony Santilli dated Nov. 20, 2018 ("Tr."), attached as Ex. 3 to Letter in Supp. of Gov't's Opp. dated Jan. 17, 2020, Dkt. No. 31 at 4:08–4:12).

---

[1] Neither side contends that Mendonca did not waive his rights at his home.

After an interview with law enforcement at his home, Mendonca went to the 63rd Precinct of the New York Police Department ("NYPD") with law enforcement, (Compl. ¶ 9), where he was questioned and a polygraph test was conducted. At the precinct, NYPD Detective Anthony Santilli ("Detective Santilli" or "Santilli") read Mendonca his *Miranda* rights, and Mendonca orally agreed to answer questions, waiving his *Miranda* rights for a second time:

> SANTILLI: O.K. So before we get started we are in a police facility. Uhm, before I ask . . . ask any questions I know you, uhm, were read your Miranda rights before in your house, correct?
>
> MENDONCA: Uhm-hum.
>
> SANTILLI: I'm going to read them again to you now.
>
> MENDONCA: Yeah.
>
> SANTILLI: O.K.? Uh, so just need you to verbally respond, uh, yes or no. O.K.?
>
> MENDONCA: O.K.
>
> SANTILLI: Uh, you have the right to remain silent and refuse to answer questions, do you understand?
>
> MENDONCA: Uhm-hum.
>
> SANTILLI: Uh, is that a yes?
>
> MENDONCA: Yes.
>
> SANTILLI: All right. Anything you do say can . . . may be used against you in a court of law, do you understand?
>
> MENDONCA: Yes.
>
> SANTILLI: You have the right to consult an attorney before speaking to the police and to have an attorney present before any questioning now or in the future, do you understand?
>
> MENDONCA: Yes.

> SANTILLI: If you do not have an attorney available, you have the right to remain silent until you've had an opportunity to consult with one, do you understand?
>
> MENDONCA: Yes.
>
> SANTILLI: Now that I'm . . . I've advised you of your rights, are you willing to answer questions?
>
> MENDONCA: Yes.

(Tr. at 4:08–5:19).

Mendonca was questioned regarding his personal, educational, and professional background. (*Id.* at 5:20–15:12). Then, Mendonca was asked about his willingness to take a polygraph test, and the following exchange occurred between him and Detective Santilli, which is the basis for his motion:

> SANTILLI: . . . Uhm. O.K. So. Let's see if I'm missing anything here. O.K. So we're . . . in . . . in regards to the polygraph, no one can force you to take a test today. It has to be 100% voluntary for it to work.
>
> MENDONCA: Uhm-hum.
>
> SANTILLI: O.K.? Uhm. I'm going to explain to you, like I said, how the polygraph works. I'm going to review the test questions with you beforehand . . .
>
> MENDONCA: O.K.
>
> SANTILLI: . . . so there's not going to be any surprises. I'm not going to jump out with you and hit you with a surprise question and try and get you to react.
>
> MENDONCA: O.K.
>
> SANTILLI: You know? Everything is going to, like I said, be explained to you beforehand. If at any time you want to stop, then you are free to go. O.K. . . .
>
> MENDONCA: O.K.
>
> SANTILLI: . . .we're not holding you here. You're not under arrest . . .

3

MENDONCA: Uhm-hum.

SANTILLI: . . . uh, if you do take the test you only need to release the result . . . allow me to release the results to the, uhm, to the agents that, uhm, that were here, uh, at your house at Homeland, uh, plus the NYPD will maintain those results also. O.K.?

MENDONCA: Uhm-hum.

SANTILLI: Uhm. If the chart . . . if I can read the charts clearly today I will give you the results today.

MENDONCA: O.K.

SANTILLI: O.K.? If I can't then I'll . . . I'll call you up, I'll let you know how you did at a later date if that . . . you know, if I need to take them back to really review the charts.

MENDONCA: Uhm-hum.

SANTILLI: O.K.? More than likely I'll be able to give you an answer today though, all right? Uhm. Right now you're the only person that knows whether or not, uh, you did this, right? Why you're here. Uhm. And, uh, I'm sure they explained to you kind of why you're here today.

MENDONCA: Uhm-hum.

SANTILLI: O.K. The child pornography . . .

MENDONCA: Right.

SANTILLI: . . . happening. Uhm. If you take this test in about two hours we'll both know.

MENDONCA: O.K.

SANTILLI: O.K.? If you did do this, you should refuse the test.

MENDONCA: O.K.

SANTILLI: O.K.? If you didn't do it, it's an easy way for me to eliminate you as a suspect.

MENDONCA: Uhm-hum.

SANTILLI: So to be able to say, listen, you passed this test, he's, you know, he's telling the truth.

    MENDONCA: Uhm-hum.

    SANTILLI: O.K.? Uhm, do you . . . are you willing to . . . you still want to continue with the test?

    MENDONCA: Of course.

(*Id.* at 15:13–18:01). Detective Santilli explained the Polygraph Consent and Release Form to Mendonca: "[T]his is just . . . what I explained to you before on the polygraph consent and release . . . and it just explains the same thing that I'm not forcing you to take the test or anything like that." (*Id.* at 18:04–18:07). Mendonca signed the form. (*Id.* at 18:04–18:20; Polygraph Consent and Release Form dated Nov. 20, 2018 ("Polygraph Consent and Release Form"), attached as Ex. 4 to Letter in Supp. of Gov't's Opp. dated Jan. 17, 2020, Dkt. No. 30).[2]

    Detective Santilli then proceeded to ask Mendonca questions about the case, his background, and his wellbeing; Mendonca then made several non-incriminating statements. (*See* Tr. at 18:20–35:21). Santilli then described how the polygraph test would proceed and administered the exam in several stages. (*See id.* at 37:17–74:19). At the conclusion of the polygraph exam, Detective Santilli told Mendonca that he had failed the test and then asked him several more questions about his interactions and

---

[2] By signing the form, Mendonca agreed "to be examined by a polygraph detection technique"; that he was "aware that the expert opinion" regarding the exam "may be that [he has] not been truthful"; that he was "in good physical and mental condition and [he] kn[e]w of no physical or mental condition that would affect or prevent [him] from submitting to this exam"; that "having the test explained to [him] in detail," he consented to the attachments of the physical components to his person; that he understood that he could "terminate the examination at any time" and "speak to an attorney at any time"; and since the agreement was legally binding, "if not completely understood," he should not sign the form, "but seek competent advice, such as may be rendered by an attorney." (Polygraph Consent and Release Form at 1).

relationships with children, computer devices, and internet activity. (*See id.* at 75:02–89:13).

Detective Santilli was then joined by FBI Special Agent Krista Cousins, and the two interviewed Mendonca. (*Id.* at 89:15–183:13). During this portion of the interview, Mendonca made incriminating statements. Among other things, Mendonca stated he had come across child pornography videos and although not realizing the age of the children in the videos, he viewed and downloaded such videos. (*Id.* at 156:16–157:15; 158:10–160:25; 171:01; 175:16–175:16; 178:16–179:05). At the end of the interview, Mendonca signed a handwritten statement in which he said he was at the 63rd Precinct where he was told about how child pornography was found on his computer; he uses a website to download, among other things, videos to an external drive; he is very sorry for downloading and keeping "this"; he needs help on "this, and what to do"; and he never took pictures or videos of kids "in any way, and will never do that [.]" (Statement of Anthony Mendonca dated Nov. 20, 2018, attached as Ex. 2 to Gov't's Resp. in Opp. to Mot. dated Oct. 29, 2019, Dkt. No. 27; Tr. at 182:12–183:07). Mendonca was then arrested for possession of child pornography.

The following month, Mendonca was indicted on one count of knowing and intentional possession of child pornography in violation of 18 U.S.C. §§ 2252(a)(4)(B), 2252(b)(2), and 3551 *et seq.* (Indictment dated Dec. 17, 2018, Dkt. No. 9 at 1). Mendonca was arraigned on the count on December 20, 2018, and entered a plea of not guilty. (Min. Entry dated Dec. 20, 2018, Dkt. No. 10). The case against Mendonca was referred to the undersigned for all pretrial matters by the Honorable Brian M. Cogan. (Order Referring Case dated Dec. 21, 2018).

On September 27, 2019, Mendonca moved to suppress statements made on the day of his arrest as in violation of *Miranda*. (Def.'s Mot. to Suppress Statements dated Sept. 27, 2019 ("Mot."), Dkt. No. 23; Def.'s Mem. of Law in Supp. of Mot. dated Oct. 16, 2019 ("Def.'s Br."), Dkt. No. 26). Briefing on the motion was completed on October 29, 2019; oral argument was held on December 20, 2019; and the parties submitted additional materials on January 17, 2019. (Gov't's Resp. in Opp. to Mot. dated Oct. 29, 2019, Dkt. No. 27; Min. Entry & Order dated Dec. 20, 2019; Letter in Supp. of Gov't's Opp. dated Jan. 17, 2020, Dkt. No. 31).

Mendonca argues that any statements made during or after the polygraph test were coerced and not the product of a knowing waiver of his *Miranda* rights. (Def.'s Br. at 2). Mendonca contends that Detective Santilli made material misrepresentations of the potential benefit of the polygraph test and impermissibly offered legal advice. (*Id.* at 3–4). He also argues Santilli implied or told Mendonca that if he was not guilty, he should submit to polygraph, but if he were guilty, he should not. (*Id.* at 4). This alleged Hobson's choice, Mendonca argues, made any election to remain silent and not submit to the polygraph into an admission of guilt. (*Id.* at 4–5). Finally, he argues that Detective Santilli's statement that Mendonca failed the test later on in the interview was coercive. (Tr. of Hearing on Mot. dated Dec. 20, 2019, Dkt. No. 32 at 41:16–22). For the reasons explained below, the Court finds these arguments without merit and recommends that the motion be denied.

## DISCUSSION

"The *Miranda* Court formulated a warning that must be given to suspects before they can be subjected to custodial interrogation." *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010). An "accused's statement during a custodial interrogation is inadmissible at

7

trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived *Miranda* rights' when making the statement." *Id.* at 382 (alteration omitted) (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)). "The waiver inquiry 'has two distinct dimensions': waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Id.* at 382–83 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). "An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver." *Butler*, 441 U.S. at 373. "The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case." *Id.* The "inquiry into the knowing and voluntariness of a waiver is 'directed to a defendant's state of mind, which can be inferred from his actions and statements.'" *In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 177, 211 (2d Cir. 2008) (quoting *United States v. Spencer*, 995 F.2d 10, 11 (2d Cir. 1993)).

     It is beyond dispute that Mendonca orally waived his *Miranda* rights before the polygraph test and did so twice. First, at his home, Mendonca was read his *Miranda* rights, and he waived them by answering police questions. (Home Interview Recording at 1:21–1:37). During subsequent questioning at the precinct, he confirmed that he was read his rights at his home. (Tr. at 4:09–4:12). Second, at the precinct, Detective Santilli advised Mendonca again. Mendonca confirmed that he understood those rights. (*Id.* at 4:18–5:16). Having done so, Mendonca was asked, "[A]re you willing to answer

8

questions?" (*Id.* at 17:20–17:21).  Mendonca responded, "Yes," (*id.* at 18:01), and proceeded to do so.  Mendonca makes no argument that either of these waivers was coerced.  "[W]ith a full understanding" of his rights, Mendonca "acted in a manner inconsistent with their exercise when he chose to begin speaking" and therefore "made a deliberate choice to relinquish the protections those rights afford."  *United States v. Plugh*, 648 F.3d 118, 128 (2d Cir. 2011) (quotations omitted).

Nonetheless, a waiver at one point does not "guarantee that all subsequent statements were voluntarily made."  *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014) (quotations omitted).  That is to say, even in the face of a valid waiver, a defendant's statements may be considered involuntary and therefore, subject to suppression.  *In re Terrorist Bombings*, 552 F.3d at 212 ("[W]e cannot dispense with the voluntariness inquiry simply because we determine that a defendant's waiver was valid." (quotations omitted)); *see also Dickerson v. United States*, 530 U.S. 428, 444 (2000) ("The requirement that *Miranda* warnings be given does not, of course, dispense with the voluntariness inquiry.").  But "as the Supreme Court has observed, 'cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare.'"  *In re Terrorist Bombings*, 552 F.3d at 212 (quoting *Dickerson*, 530 U.S. at 444).

"When evaluating voluntariness," a Court must "make a case-by-case determination based upon the totality of the circumstances [.]"  *United States v. Gaines*, 295 F.3d 293, 297–98 (2d Cir. 2002) (first citing *Butler*, 441 U.S. at 373) (then citing

9

*Tankleff v. Senkowski,* 135 F.3d 235, 244–45 (2d Cir. 1998)).[3] These circumstances include "the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials." *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991); *United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018) (same). A statement is coerced if the circumstances demonstrate that "the government agents' conduct 'was such as to overbear a defendant's will to resist and bring about confessions not freely self-determined.'" *United States v. Kaba*, 999 F.2d 47, 51 (2d Cir. 1993) (alteration omitted) (quoting *United States v. Guarno,* 819 F.2d 28, 30 (2d Cir. 1987)); *United States v. Walia*, No. 14-CR-213, 2014 WL 3563426, at *12 (E.D.N.Y. July 18, 2014) ("The critical inquiry is whether under the totality of the circumstances the defendant's will was overborne by the agent's conduct." (alteration omitted)).

Mendonca argues he was coerced into making statements because Detective Santilli allegedly described the polygraph test in a way that implied that not taking the test was an admission of guilt. Mendonca takes issue with Detective Santilli's telling him, "If you did do this [possessed child pornography], you should refuse the test. . . . If you didn't do it, it's an easy way for me to eliminate you as a suspect. . . . So to be able to say, listen, you passed this test, he's, you know, he's telling the truth," (Tr. at 17:12–17:18).

Mendonca's suggestion that this was a Hobson's or improper choice is without merit. Santilli told Mendonca, "if you did do this," i.e. possessed child pornography, "you should refuse the test." In so doing, Santilli did not tell Mendonca that if he

---

[3] The prosecution has the burden of proving a knowing and voluntary waiver, *United States v. O'Brien*, 926 F.3d 57, 73 (2d Cir. 2019), and the voluntariness of an accused's confession, *Winkfield v. Duncan*, No. 12-CV-3237, 2013 WL 597595, at *19 (E.D.N.Y. Feb. 15, 2013) (citing *Tague v. Louisiana,* 444 U.S. 469, 470–71 (1980)).

declined the polygraph, Santilli or anyone else would use that decision against Medonca. To the contrary, Santilli told Mendonca that a positive test result could be used by Santilli to assist Mendonca. ("So to be able to say, listen, you passed this test, he's, you know, he's telling the truth." (*Id.* at 17:17–17:18)). Santilli never said there would be negative consequences, such as an inference of guilt from refusing the test, or that Santilli would use the test result in a way that would disadvantage Mendonca.

Assuming that Detective Santilli misled Mendonca by implying that not taking the polygraph suggested guilt, that is insufficient to render Mendonca's subsequent oral and written statements involuntary. "[P]olice conduct [that] is 'false, misleading, or intended to trick and cajole the defendant into confessing' does not necessarily render the confession involuntary." *Haak*, 884 F.3d at 409 (quoting *Anderson*, 929 F.2d at 99). For a confession to become involuntary, there must be some evidence that the defendant's "will was overborne by the police conduct." *Id.* (alteration omitted). There is no such evidence here.

For one thing, Mendonca has not identified a misleading or false statement that cajoled him into giving inculpatory statements. Instead, Mendonca asks the Court to infer that Santilli's encouragement to take the polygraph—*e.g.*, "If you didn't do it, [the test is]. . . an easy way for me to eliminate you as a suspect"—coerced him into making statements he would not have otherwise given. The record does not support such a conclusion. Santilli never made any statements, promises, or assurances about anything other than the polygraph. To the extent those statements were false, they were about the polygraph and nothing else. Mendonca was not even asked to speak; rather he was asked to take a polygraph test. In other words, Detective Santilli's description of the polygraph test was divorced from any waiver or invocation of the right to remain silent

11

and separate from Mendonca's subsequent statements he now seeks to suppress. *Cf. Colorado v. Connelly*, 479 U.S. 157, 164 (1986) ("Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law.").

It is a stretch to tether the polygraph portion of the interview to Mendonca's statements. Perhaps Mendonca was induced to take the polygraph test, but it is difficult to see how that coerced him into making subsequent oral statements and a subsequent written confession.[4] The statements Mendonca challenges were made almost two hours after the polygraph was administered. And at no point did Santilli—either by implication or directly—say that by taking the polygraph, Mendonca could not invoke the right to silence, tell him that he could be forced to talk or confess, or otherwise place pressure on him to make any statement. Nor did Santilli do so by telling Mendonca that he had failed the polygraph. Being confronted with polygraph results—without more—does not demonstrate that subsequent statements were provided under coercion. This absence of any connection—express or implied—between the polygraph and the subsequent statements demonstrate that Mendonca's statements were made voluntarily and the original knowing and repeated waivers of his *Miranda* rights remained valid. *See United States v. Boy*, 19 F.3d 30, 1994 WL 59781, at *2 (9th Cir. 1994) (unpublished table decision) ("Looking at the circumstances surrounding appellant's questioning after the polygraph test, we hold that the district court did not clearly err in denying

---

[4] The Government is not seeking to introduce the polygraph, (Tr. of Hearing on Mot. dated Dec. 20, 2019, Dkt. No. 32 at 3:08–3:11), nor would it likely be able to do so, *United States v. Hester*, 674 F. App'x 31, 35 (2d Cir. 2016) ("While we have never held that polygraph evidence is *per se* inadmissible, we have upheld its exclusion on grounds that it may be unreliable, unfairly prejudicial, or misleading to the jury.").

appellant's motion to suppress.  Other than the fact that appellant was confronted with the results of his test which indicated that he was lying and the fact that the officers' questioning was admittedly 'confrontational,' there is little evidence indicating physical or psychological coercion.  Defendant was advised orally and in writing of his *Miranda* rights prior to taking the test and was advised that he was not in custody and was free to leave at any time."); *People v. Serrano*, 14 A.D.3d 874, 875 (3d Dep't 2005) ("Initially, defendant contends that his confession was involuntary because it was made after police used unfair interrogation tactics such as questioning him for 12 hours and informing him that he failed a polygraph examination. . . . [S]uch police stratagems do not compel a conclusion of involuntariness unless there is a showing that the deception was so fundamentally unfair as to deny due process or that it was accompanied by a promise or threat that could induce a false confession . . . . Defendant makes no allegation of any such threats or promises here." (citations, quotations, and alteration omitted)).

And the mere intervention of the polygraph test between Mendonca's waivers and his inculpatory statements did not require the police to re-*Mirandize* him or ask again whether he wished to waive his rights.  The transition from a polygraph test to a new round of questioning, in other words, does not establish involuntariness.  *United States v. Terui*, 781 F. App'x 638, 639 (9th Cir. 2019) (citing *Wyrick v. Fields*, 459 U.S. 42, 48–49 (1982) (per curiam)); *e.g.*, *United States v. Gibson*, 108 F. App'x 975, 976–77 (5th Cir. 2004) ("Gibson concedes that he was informed of his *Miranda* rights prior to taking the polygraph examination as well as his rights not to take the polygraph examination, not to answer any questions, not to answer specific questions, to have a lawyer present during the examination, and to stop the examination at any time.  He complains that Agent Spiers did not again inform him of his rights before beginning the post-test

13

interrogation. This argument is without merit."); *United States v. Randles*, 765 F.2d 147, 1985 WL 13351, at *1 (6th Cir. 1985) (unpublished table decision) ("[T]he waiver which [defendant] executed prior to the polygraph examination would carry over and cover 'post-test' questioning, unless the circumstances changed so seriously that her answers no longer were voluntary, or unless she no longer was making a 'knowing and intelligent relinquishment or abandonment' of her rights. No such change of circumstances was shown.'" (alterations and citations omitted) (quoting *Wyrick*, 459 U.S. at 47)).

In addition, nothing about Mendonca's personal characteristics or the circumstances under which he was being held and interrogated, suggests that Mendonca could have (or did) confuse the polygraph test with his rights to speak or not. Mendonca is an English-speaking United States citizen with a bachelor's degree. (Tr. at 20:14–21:18). He is generally in good physical health and did not present any conditions that affected his interview. (*See id.* at 22:02–29:08). The interview was conducted over the course of a few hours, and Mendonca was offered water, food, and trips to the bathroom. (*See, e.g.*, *id.* at 2:06–2:07, 36:03).

In sum, "[c]areful perscrutation of the record fails to disclose any extrinsic factors . . . that could have distorted the defendant's judgment about whether to speak freely to them. Thus, the challenged statements can fairly be considered voluntary." *United States v. Hughes*, 640 F.3d 428, 439–40 (1st Cir. 2011). This is not one of the "rare" cases where a defendant's "self-incriminating statement was compelled despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* [.]" *Dickerson*, 530 U.S. at 444 (quotations omitted).

14

As for the argument about allegedly improper legal advice, Santilli did not present legal advice to Mendonca. The exchange prior to the polygraph test was purely a recitation about what Santilli might or might not be able to do with the results. That Santilli might be able to approach a superior with a negative test in an effort to let Mendonca go does not amount to giving Mendonca legal advice. Santilli said nothing about the *legal* effect of a polygraph test or result. *See, e.g.*, *United States v. Bad Hand*, 926 F. Supp. 891, 892–93, 901 (D.S.D. 1996) (adopting report and recommendation) (denying motion to suppress where defendant argued, among other things, agent "offered legal advice" when he stated to Defendant, "if you are innocent, you should take the test.").

Mendonca waived his rights and made voluntary statements, uncoerced by law enforcement. Thus, his statements were not obtained in violation of *Miranda* or otherwise involuntary.

## CONCLUSION

For the reasons stated above, it is respectfully recommended that Mendonca's motion to suppress be denied.

\*    \*    \*    \*

Pursuant to Federal Rule of Criminal Procedure 59(b)(2), either party may object to this Report and Recommendation within 14 days of the date of service of this Report. Failure to object to this Report and Recommendation in accordance with Rule 59 may waive a party's right to review. *See* Fed. R. Crim. P. 59(b)(2); 28 U.S.C. § 636(b)(1); *United States v. Ballares*, 317 F. App'x 36, 38 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate judge's report may operate as a waiver of any further judicial review of the decision, as long as the parties receive clear notice of the consequences of their

15

failure to object." (quoting *United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997)).

<u>/s/ *Sanket J. Bulsara* Feb. 4, 2020</u>

SANKET J. BULSARA
United States Magistrate Judge

Brooklyn, New York